UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| ANGELA VAZQUEZ and | : | CASE NO. 07-21276-CIV-UNGARO |
| TOP REALTORS, INC., | : | |
| | : | Magistrate Judge O'Sullivan |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| 4011 PROFESSIONAL CENTER | : | |
| CONDO., INC., | : | **PLAINTIFF's RESPONSE TO** |
| | : | **DEFENDANT's MOTION FOR** |
| Defendant. | : | **SUMMARY JUDGMENT** |

Plaintiff, through counsel, files her Response to Defendant's Motion For Summary Judgment. Plaintiff's Statement of Facts ("SOF") is filed concurrently herewith.

## I. INTRODUCTION

In brief, as evidenced by Plaintiff's Statement of Facts, Plaintiff has established that she was disabled on the date that she fell at Defendant's building located at 4011 W. Flagler St., Miami (the "Building") and that she is now more disabled because of that fall. Defendant's failure to proffer any medical evidence to support its position that Plaintiff is not disabled is fatal to its motion.

Plaintiff's Statement of Facts also demonstrates that Defendant's Building not only violates Title III of the ADA in several key areas, it knowingly violated a Court approved Settlement Agreement by not making its building compliant with Title III of the ADA. Had Defendant complied with that May 17,

-1-

2002 Settlement Agreement, Plaintiff would not have been injured at the Building as she was on March 12, 2007.

Defendant's myopic concentration of Plaintiff's physical condition just prior to her fall at the Building on March 12, 2007 is misplaced. Plaintiff did not file her ADA Title III claim until after her fall at the Building. As such, for purposes of analyzing Plaintiff's claim of disability, what her physical condition was prior to her fall is irrelevant.

## II. UNDISPUTED FACTS

### A.   Plaintiff's Disabled Status

Plaintiff is disabled as defined by the Americans With Disability Act since her movements and her ability to walk are extremely restricted and have gotten significantly worse since her fall at the Building.  SOF ¶¶ 11-20.[1]

Plaintiff, who is 67 years old, has not worked since 1988 because of a combination of serious medical conditions.  SOF ¶11. On the date of her fall at the Building, Plaintiff was approved for a handicap sticker due to her walking limitation.  SOF ¶11.   In 2000, Plaintiff was declared "disabled" by her medical doctor due to her bad back and since that date until 2005[2], she received social security benefits.  SOF ¶11.

Before Plaintiff had an operation on her back in August 2006, Plaintiff was unable to stand, walk or move without being in

---

[1]"SOF" = Plaintiff's Statement of Facts.

[2]The benefits stopped due to a reason not related to Plaintiff's disabled status.

agonizing pain. Plaintiff had to use a cane or a walker all of the time. On a good day, Plaintiff could walk 10-15 feet without having to stop to grab onto something or to rest. Plaintiff could not walk down or up steep hills or ramps like the ramp in the Building without receiving assistance from someone. On a bad day, Plaintiff could not even get out of bed. SOF ¶12.

After the operation in August 2006, the pain in Plaintiff's back lessened so that she was not in agony every time that she moved. Plaintiff's ability to walk, stand or even move, however, was still extremely restricted but because Plaintiff was not living in agony, Plaintiff was better than before the operation. That is why Plaintiff described her condition after the operation but before her fall at the Building as "fine" since less pain is better than agonizing pain. SOF ¶13.

From the time that Plaintiff's daughter moved into the Building, because of Plaintiff's physical limitations, Plaintiff did not use the stairs to exit the Building that often since she could only use the stairs when she received assistance from someone to go up or down the steps. For that reason, like the other wheelchair users or persons using canes/walkers going to the Building, whenever Plaintiff went into the Building or exited from it, Plaintiff almost always used the Building's ramp. SOF ¶14.

Because the Ramp is extremely steep, however, Plaintiff almost always received assistance from someone at the Building to go down or up the ramp. On most occasions, the Building's former Maintenance Manager, Mr. Humberto Almenteros, used to help

-3-

Plaintiff up and down the ramp.  When no one was around to help Plaintiff up or down the ramp, Plaintiff would grab onto the ramp's railing with both hands and walk extremely slowly up or down the ramp.  Plaintiff could not and cannot walk up or down the Building's ramp without holding onto the railing with both hands or without getting assistance from someone.  SOF ¶15.

On March 12, 2007, at around 2:00 P.M., Plaintiff exited the Building using its ramp.  Since Plaintiff did not find Mr. Almenteros to help her down the ramp, Plaintiff grabbed onto the railing with both hands and slowly started down the ramp.  At that time, because the ramp was slippery from the grey paint and its steep incline, Plaintiff fell and hurt herself.  SOF ¶16.

On the date that Plaintiff fell while going down the Building's ramp, based on injuries to her back, her asthma and her heart condition, according to the American Medical Association's Guidelines, Plaintiff was 20% disabled for her body as a whole since Plaintiff had metal screws and rods/implants inserted into her back from the August 2006 operation.  After Plaintiff's fall, however, her physical condition has worsened to the point where Plaintiff's right foot simply does not work since she has no sensation in that foot and Plaintiff almost always has to use a cane or walker to go anywhere.  SOF ¶17.

After the fall, on a good day, Plaintiff can walk 20-25 feet without assistance and for a duration of less than five (5) minutes.  While Plaintiff's doctors encourage Plaintiff to not use a cane or walker since that may reduce any atrophy to her muscles,

-4-

after the fall, Plaintiff almost always uses a cane or walker and she always takes pain medications for her feet and back. The EEOC's regulations provide that "an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking." 29 C.F.R. pt. 1630 App. §1630.2(j). Sometimes to lessen the pain when Plaintiff has to walk more than 20 feet, Plaintiff walks sideways since that hurts less than walking straight ahead. SOF ¶18.

On a bad day, after the fall at the Building, Plaintiff is back to not even getting out of bed due to the pain in her feet and back. Most nights Plaintiff either cannot get to sleep because of the pain or she wakes up several times during the night because of the pain in her feet and back. On Plaintiff's bad days, she cannot visit her daughter at the Building. SOF ¶19.

B.    The Building's ADA Title III Violations

The Building's ramp violates ADA Title III. SOF ¶20.
The Building's entrance violates ADA Title III. SOF ¶21.
The Building's elevator violates ADA Title III. SOF ¶22.
The Building's bathrooms violate ADA Title III. SOF ¶23.

C.    Defendant Knowingly Violated Title III Of The ADA

Prior to Plaintiff's fall, on May 17, 2002, in an ADA Title III case brought against Defendant, Defendant agreed to modify and repair the Building so that it complied with Title III of the ADA. Within a two (2) year time span from May 17, 2002 (i.e., May 18, 2004), Defendant specifically agreed to improve and/or modify the Building in the following manners to comply with Title III of the ADA:

a.  Parking - Defendant agreed to add one (1) disabled parking spot;

b.  Entrance - Defendant agreed to modify its entrance with either a ramp or a lift;

c.  Bathrooms - Defendant agreed to add a single unisex disabled bathroom with appropriate signage;

d.  Elevator - Defendant agreed to modify its elevator with a standard disability improvement package;

e.  Drinking fountain - Defendant agreed to remove all drinking fountains; and

f.  Exterior door handles - Defendant agreed to add lever exterior door handles to all units, the unisex disables bathrooms and exits.

SOF ¶4

On May 20, 2002, the Settlement Agreement was approved by the U.S. District Court Judge assigned to the ADA Title III case. SOF ¶5.

On February 19, 2004, Plaintiffs in the first ADA Title III case brought against Defendant filed a Motion To Enforce Settlement Agreement based on Defendant's failure to take any action to comply with the Settlement Agreement. SOF ¶6.

On March 16, 2004, Defendant, who was being represented by Defendant's current counsel, filed its response to the Motion To Enforce Settlement Agreement by claiming that Defendant was well on its way to complying with all terms and conditions of the Settlement Agreement and that by May 18, 2004, Defendant will have brought the Building into compliance with Title III of the ADA as required by the Settlement Agreement. SOF ¶7.

Based on Defendant's representations made in its Response, on April 15, 2004, the U.S. District Court Judge assigned to the first

ADA Title III case denied the Motion To Enforce Settlement. SOF ¶8.

On January 25, 2008, Defendant's Corporate Representative's deposition was taken and Defendant's Accountant/Property Manager appeared on behalf of Defendant. In that deposition, Defendant's Corporate Representative admitted the following:

a.  The Settlement Agreement required that all changes be made on or before May 18, 2004;

b.  Defendant completed the required parking modifications on time;

c.  Defendant failed to complete or even start the required ramp and/or entrance modifications as of the date of the deposition;

d.  Defendant failed to complete the required unisex disabled bathroom modifications as of the date of the deposition; and

e.  Defendant claims that it completed the required elevator retrofit in late 2007 or early 2008.

SOF ¶9.

## III. STANDARD OF REVIEW

This Court, in reviewing Defendant's Motion For Summary Judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(c), which states, in relevant part, as follows:

The Judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to Judgment as a matter of law.

-7-

The moving party bears the burden of meeting this exacting standard.[3]   That is, "[t]he moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"[4]

In assessing whether the moving party has satisfied this burden, the court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party.[5]   If the record presents factual issues, as in the instant case, the court must deny the motion and proceed to trial.[6]   Even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from those facts, as in this case, summary judgment is still inappropriate.[7]

---

[3]Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

[4]U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Celotex, 477 U.S. at 323).

[5]See Sheckells v. Agv-Usa Corp., 987 F.2d 1532 (11th Cir. 1993); Browning v. Peyton, 918 F.2d 1516, 1520 (11th Cir. 1990); Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1368 (11th Cir. 1982); Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)(per curiam).

[6]Adickes, 398 U.S. at 157; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[7]Anderson, 477 U.S. at 255; U.S. v. Twenty (20) Cashier's Checks, 897 F.2d 1567, 1569 (11th Cir. 1990).   As noted by the court in Anderson, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a Judge. ..."  477 U.S. at 255. See also Ryder Int'l Corp. v. First Amer. Natl. Bank, 943 F.2d

Based on the above-mentioned exacting standards to grant summary judgment, and Plaintiff's proffer that she is disabled, that she had and has standing to bring the instant claim, and that Defendant knowingly violated Title III of the ADA based on the Building's multiple ADA Title III violations, summary judgment in the instant case should be denied.

---

1521, 1523 (11th Cir. 1991).

## IV.  ARGUMENT & CITATION OF AUTHORITY

As a preliminary matter, the language of the Title III of the ADA is "a remedial statue, which should be broadly construed to effectuate its purpose of eliminating discrimination against the disabled in our society."[8]  The provisions of Title III of the ADA prohibits discrimination against disabled persons, like Plaintiff, in any place of public accommodation.  See 42 U.S.C. §§12102(2), 12181(7).[9]

---

[8]See Trafficante v. Metropolitan Ins. Co., 409 U.S. 205, 209 (1972); Steger v. Franco, Inc., 228 F.3d 889, 893 (8th Cir. 2000); Dunkelberger v. Uni-Marts, 1998 WL 195906, at *2 (E.D. P.A. April 14, 1998).

[9]In enacting Title III of the ADA, Congress found that:

(1)  some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population is growing older;

(2)  historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3)  discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations....

(5)  individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, activities, benefits, jobs, and other opportunities;

(9)  the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis

Here, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilitates, privileges, advantages, or accommodations of any place of public accommodation..."  See 42 U.S.C. §12182(a). Liability is imposed upon "any person who owns, leases, (or leases to), or operates a place of public accommodation" that discriminates against an individual on the basis of disability. Id.   Such discrimination includes the failure to remove "architectural barriers" in existing facilities where such removal is "readily achievable" or failure to make such facilities available through alternative methods if such methods are readily

---

and to pursue those opportunities for which our free society is justifiably famous and costs the Unites States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

See 42 U.S.C. §121101(a)(1)-(3), (5) and (9).

Congress went on to say that the express purpose of the ADA Title III was to:

(1)  provide a clear and comprehensive national mandate for the elimination o discrimination against individuals with disabilities;

(2)  provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

(4)  invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

Congress gave Defendants and all other public access buildings one and one half years from January 26, 1992 to comply with Title III of the ADA.

available.    See 42 U.S.C. §12182(b)(2)(A)(iv) and (v).   Defendant
has not challenged Plaintiff's standing to bring an ADA Title III
claims against Defendant for its failure to comply with the
mandates imposed on them by Congress.[10]

In the instant case, Plaintiff wants Defendant to make the
Building accessible so that she and other disabled persons like her
can use the buildings like non-disabled persons.  Because a private
action under the ADA may provide "injunctive relief... to [ ] make
facilities readily accessible to and usable by individuals with
disabilities," appropriate relief includes total compliance with
the ADA.   See Emerick v. Kahala L& L, Inc., 2000 WL 687622, *12 (D.
Hawaii)   (a   disabled   person's   desire   to   patronize   a   local
restaurant, but is unable to do so because of the ADA violations,
is real and personal and establishes standing).

As  stated  above,  because  Plaintiff  is  seeking  injunctive
relief to cure or address the architectural barriers that she
encountered at Defendant's Building, which Defendant agreed to
remove on or before May 18, 2004, such injunctive relief would
include "an order to alter the facilities to make such facilities
readily   accessible   to   and   usable   by   individuals   with
disabilities...."   42 U.S.C. §12188(a)(2).

---

[10]See Johanson v. Huizinga Holdings, Inc., 963 F.Supp. 1175,
1177 (S.D. Fla. 1997); Botosan v. Paul McNally Realty, 216 F.3d 827
(9th Cir. 2000) (standing by person suing office building since
building did not have adequate handicap parking); Steger v. Franco,
Inc., 228 F.3d 889 (8th Cir. 2000) (blind visitor to office
building had standing to sue since he could not get into bathrooms
where he had been in building before filing suit).

Impairment, as defined at 28 C.F.R. §36.104, for Title III cases is a broad term. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 490 (1990). The EEOC defines "major life activities" as "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. pt. 1630 App. §1630.2(i). According to the EEOC, they include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working." 29 C.F.R. §1630.2(i).

In this case, Plaintiff's ability to walk before her fall at the Building and after her fall at the Building falls way below that of "the average person in the general population." On March 12, 2007, Plaintiff could not walk down the ramp without assistance or without holding onto the rail with both her hands while taking small steps.

Now, Plaintiff's ability to walk is substantially worse than it was before she fell. As provided in Bragdon v. Abbott, 524 U.S. 624, 641 (1998), contrary to Defendant's suggestion that "substantial limitation" does not need to rise to the level of "utter inabilities." On Plaintiff's "bad days," when she lies in bed in agony due to her physical condition from the fall at the Building, she is not even walking.

Moreover, the complained of condition (in this case Plaintiff's ability to walk or move like a normal person) does not need to be continuous. See Bragdon v. Abbott, 524 U.S. 624, 641 (1998); Taylor v. Phoenixville School Dist., 184 F.3d 296, 308-09

(3d Cir. 1999) (episodic condition can easily qualify person for coverage under the ADA). Here, Plaintiff had and has good days and bad days. On good days, Plaintiff can walk 20-25 feet without assistance. See PGA Tour v. Martin, 532 U.S. 661, 121 S.Ct. 1879, 1885-86 (2001) (disability was not contested on appeal but Court noted that Martin had a disability to because his degenerative circulatory disorder caused severe pain and prevented him from walking an 18-hole golf course); D'Amato v. Long Island Railroad Co., 2001 WL 563569 (S.D. N.Y may 24, 2001) (inability to walk 50-100 feet is enough evidence of a substantial limitation in walking to go to the jury). As provided above, on bad days, Plaintiff cannot even get out of bed because of the pain she experiences in her back and feet. SOF ¶¶18-19.

In this case, Plaintiff suffers from multiple diagnosed chronic conditions that combine to limit her daily ability to work (Plaintiff has not worked since 1999), drive (she has a handicap sticker), and walk. See 29 C.F.R. pt. 1630 App. §1630(2)(j); EEOC Compliance Manual §902.4(e). From 2000 through 2005, Plaintiff was receiving social security payments. See Lawson v. CSX Transportation, Inc., 245 F.3d 916, 927 (7th Cir. 2001). Since August 2006, Plaintiff has and continues to have metal rods and screws in her back. That alone gives her an impairment rating according to the American Medical Association of at least 20%. SOF ¶17.

In this case, Plaintiff has also established a clear record of her disability since she has been treated and continues to be

-14-

treated by various doctors for her back and feet. SOF ¶¶ 10-19. See Wheaton v. Ogden Newspapers, Inc., 1999 U.S. Dist. LEXIS 15841 (N.D. Iowa 1999) (multiple hospitalizations and ongoing treatments for severe back condition could constitute a "record" of disability). Defendant is simply misconstruing what Plaintiff meant as "fine" when she described her physical condition after her August 2006 operation. As provided in Plaintiff's Statement of Facts, Plaintiff's use of "fine" is comparative. Before the operation, Plaintiff was in constant agony. After the operation, Plaintiff felt better. That does not mean that Plaintiff was "fine" when compared to the average person who does not have rods and screws in their back, asthma, and a heart condition.

Even assuming that Defendant's claim that on the day that Plaintiff fell at the Building she was not "disabled," since her fall and through this date, because of the serious injuries she suffered due to the fall, Plaintiff is most certainly disabled now and at the time that she filed this lawsuit. Defendant has presented no medical evidence or other competent proffer to demonstrate the contrary. The average person does not have bad days when, because of pain to their back and feet, they cannot get out bed or they wake up constantly throughout the night due to the pain. SOF ¶19. Simply put, because of the fall, Plaintiff is back to her pre-operative condition of being in "constant pain."

Defendant's myopic concentration of Plaintiff's physical condition just prior to the fall is misplaced. Plaintiff did not file her ADA Title III claim until after her fall at the Building.

-15-

As such, for purposes of analyzing Plaintiff's claim of disability,
what her physical condition was prior to the fall is irrelevant and
her description of her physical condition as "fine" before her fall
at the Building is irrelevant to this case.

## V. CONCLUSION

Based on the foregoing, Defendant's Motion For Summary
Judgment should be denied.

Respectfully submitted,

LAWRENCE J. McGUINNESS, P.A.
Counsel for Plaintiffs
5805 Blue Lagoon Dr., Suite 145
Miami, Florida 33126
Phone No. (305) 264-5611
Fax No. (305) 264-5617
ljmpalaw@netzero.com

s/    Lawrence    J.    McGuinness
(814611)
E. ljmpalaw@netzero.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that: I electronically filed the foregoing
document with the Clerk of the Court using CM/ECF; and that the
foregoing document is being served this day on all counsel of
record or pro se parties identified on the attached Service in the
manner specified, either via transmission of the Notices of
Electronic Filing generated by the CM/ECF or in some other
authorized manner for those counsel or parties who are not
authorized to receive electronically Notices of Electronic Filing,
this March 7, 2008.

### Service List

Miguel de la O, Esq.
3001 S.W. 3rd Ave.
Miami, Fl 33129

LAWRENCE J. McGUINNESS, ESQ.
ljmpalaw@netzero.com
5805 Blue Lagoon Dr., Suite 145
Miami, Florida 33126